**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION**

| | | |
|---|---|---|
| **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** | ) ) ) | |
| **Plaintiff,** | ) ) | **Case No.  1:21-cv-01743-RDB** |
| **v.** | ) ) | **Hon. Richard D. Bennett** |
| **GREEN JOBWORKS LLC,** | ) ) | |
| **Defendant.** | ) ) ) | |

**<u>MEMORANDUM IN SUPPORT OF EEOC'S
MOTION FOR DEFAULT JUDGMENT</u>**

TABLE OF CONTENTS

**1.    Defendant's default resulting admissions and the evidence warrant**    1
**entry of default judgment on pattern-or-practice liability**

    a.    *Under Rule 55(b)(2), Defendant has admitted the facts pleaded in EEOC's*    1
*Complaint, and the Court has discretion to enter default judgment on*
*liability on the current record*

    b.    *The current record establishes Defendant's liability for a Title VII*    3
*pattern-or-practice of sex discrimination*

**2.    Defendant's default, resulting admissions and other evidence also warrant**    10
**entry of default judgment on remedies**

    a.    *Under Rule 55(b)(2), the Court is authorized to determine and award*    10
*monetary remedies without conducting an evidentiary hearing*

    b.    *A class-wide back pay award, to be distributed among the EEOC claimants*    11
*in equal shares, is appropriate in this case*

    c.    *A class-wide back pay award in the amount of $665,566.27 is supported*    15
*by the evidence in this case; equal shares distribution of the award is*
*equitable and appropriate*

    d.    *Punitive damages awards without hearing are authorized by Rule 55(b)(2)*    19

    e.    *Defendant's admissions and the evidence in this case establishes the*    20
*EEOC claimants' entitlement to punitive damages awards*

    f.    *A punitive damages award in an amount that is three-times the back pay*    29
*award is warranted by the facts of this case and case law*

**3.    Conclusion**    34

i

Pursuant to Federal Rule of Civil Procedure 55(b)(2), Plaintiff U.S. Equal Employment Opportunity Commission ("EEOC") hereby files the instant Motion for Default Judgment in the above-styled and numbered action.  For the reasons set forth more fully below, EEOC respectfully requests that the Court enter a final default judgment in this case in favor of EEOC and against Defendant Green JobWorks LLC ("Defendant"), awarding back pay and punitive damages to EEOC's claimants for sex discrimination in hiring, work assignments and assignment of job duties.

Upon entry of final judgment in this action, EEOC anticipates conducting post-judgment financial/asset discovery in aid of execution under Fed. R. Civ. P. 69(a)(2) and the Federal Debt Collection Procedures Act, 28 U.S.C. § 3015(a) (provision authorizing financial/asset discovery of debtors owing amounts to the United States).

1. __Defendant's default, resulting admissions and the evidence warrant entry of default judgment on pattern-or-practice liability__

   a. *Under Rule 55(b)(2), Defendant has admitted the facts pleaded in EEOC's Complaint, and the Court has discretion to enter default judgment on liability on the current record*

Rule 55(b)(2) authorizes district courts to enter default judgment against any party that has failed to prosecute their claims or defenses despite sufficient opportunity to do so. *Id.*  While disposition of cases on their merits is favored, *see Disney Enterprises, Inc. v. Delane*, 446 F. Supp.2d 402, 405 (D. Md. 2006), "default judgment is available when the 'adversary process has been halted because of an essentially unresponsive party[,]'" *id.* (quoting *SEC v. Lawbaugh*, 359 F. Supp.2d 418, 421 (D. Md. 2005)).

On August 9, 2022, the District Clerk entered an Order of Default in this action against Defendant for its failure to file an answer or to otherwise defend, as well as its failure as a corporate party to obtain new counsel after all previous counsel had withdrawn. *See* ECF No. 50. Subsequently, Defendant has failed to file any motion to set aside the entry of default, nor has it

1

otherwise sought to defend this action.

Upon the filing of a motion for default judgment, district courts are required to determine whether the record of the case establishes liability and, if so, to ascertain the appropriate remedy. *See, e.g., Ryan v. Homecomings Fin. Network*, 253 F.3d 778, 780-81 (4th Cir. 2001).  In making that determination, all well-pleaded factual allegations in the complaint, except any allegations pertaining to the amount of damages, are deemed to be admitted by the party that has defaulted and are to be taken as true. *See, e.g., id.* at 780 ("The defendant, by his default, admits the plaintiff's well-pleaded allegations of fact.") (internal quotation marks omitted); Fed. R. Civ. P. 8(b)(6) ("An allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied."); *Yang v. Hardin*, 37 F.3d 282, 286 (7th Cir. 1994) (holding all well-pleaded facts except those pertaining to amount of damages are admitted by default) (citations omitted). *See also* 10A C. WRIGHT, A. MILLER, & M. KANE, *FEDERAL PRACTICE & PROCEDURE,* § 2688.1 AT 444 (4th ed.) ("If the court determines that defendant is in default, the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true.").  Moreover, the party moving for default judgment is entitled to all reasonable inferences that can be drawn from the facts admitted by default and any evidence it has presented in support of its motion. *See, e.g., Yang*, 37 F.3d at 286 ("[T]he district court is obliged to accept as true all facts alleged by the plaintiff and all reasonable inferences contained therein."); *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981) (holding upon motion for default judgment all factual allegations are admitted and moving party entitled to all reasonable inferences from any evidence offered).

District courts are not required to conduct evidentiary hearings regarding motions for default judgment.  Rule 55(b) expressly grants discretion to district courts to decide whether to

conduct hearings prior to entry of a final judgment resulting from default. *See, e.g., Ryan*, 253 F.3d at 780-81; 10A C. WRIGHT, A. MILLER & M. KANE, *FEDERAL PRACTICE & PROCEDURE* § 2688 (4th ed.).

    b.  *The current record establishes Defendant's liability for a Title VII pattern-or-practice of sex discrimination*

Under controlling law, Defendant's admissions-by-default and other evidence in the case demonstrate that default judgment is clearly warranted on the issue of Defendant's liability for engaging in the pattern-or-practice of sex discrimination pleaded in EEOC's Complaint.

In a pattern-or-practice discrimination case, the issue for liability determination is whether discrimination is the company's "standard operating procedure – the regular rather than the unusual practice." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977). Once a pattern-or-practice of discrimination has been established, "[t]he force of [the pattern-or-practice] proof does not dissipate at the remedial stage of the trial. The employer cannot, therefore, claim that there is no reason to believe that its individual employment decisions were discriminatorily based; it has already been shown to have maintained a policy of discriminatory decisionmaking." *Id.* at 361-62.

Upon a showing of pattern-or-practice liability, a legal presumption arises that persons who are part of the class have been aggrieved by the discrimination and entitled to victim-specific remedies. In a hiring discrimination case, EEOC need only make the simple showing that any aggrieved person for whom it seeks relief is a member of the demographic group at issue and either unsuccessfully sought a job with the defendant-employer or was deterred from applying due to the employer's conduct. *See id*. at 362. Each claimant for whom EEOC makes this showing may be denied individual recovery *only* if the defendant-employer affirmatively proves that the person was denied employment for non-discriminatory reasons. *Id.*

Various forms of evidence, alone or in combination, may be used to establish a pattern-or-practice of discrimination.

For instance, the federal courts have uniformly held that direct evidence of invidious motivation for employment decisions is highly probative of a pattern-or-practice of discrimination. *See, e.g., Holsey v. Armour & Co.*, 743 F.2d 199, 214 (4th Cir. 1984) (stating testimony showing discriminatory statements by management related to customers' perceived racial preferences and method of recruitment provided "substantial basis" for pattern-or-practice finding); *EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1285-87 (11th Cir. 2000) (noting discriminatory admissions by owner and managers and stating, "[D]irect evidence of an intent to discriminate may be used to establish a pattern or practice claim.") (citations and internal quotations omitted).  Particularly where policy-making and other high-level officials made the discriminatory statements at issue, such facts are sufficient, standing alone, to establish a prima facie case under *Teamsters*. *See, e.g., United States v. Gregory*, 871 F.2d 1239, 1241-43 (4th Cir. 1989) (recounting sheriff's statements of policy of discrimination against female applicants for deputy sheriff and concluding, "As the Government has pointed out, if the admissions are credited, the Title VII violation has been proven [and] [r]eversal is warranted on that basis alone.").

Statistical evidence is also considered highly probative of a pattern-or-practice of discrimination, and can establish the prima facie case standing alone, *see, e.g., Hazelwood School Dist. v. United States*, 433 U.S. 299, 307-08 (1977); *EEOC v. American National Bank*, 652 F.2d 1176, 1188 (4th Cir. 1981), though such evidence is not requisite, *see, e.g., Gregory*, 871 F.2d at 1243; *Pitre v. Western Elec. Co.*, 843 F.2d 1262, 1267 (10th Cir. 1988).  The federal courts have consistently held that evidence of statistically significant demographic disparities in selection rates – i.e., disparities that are unlikely to be a result of chance, generally expressed as a .05 or smaller

probability or, alternatively, as two-to-three standard deviations from the mean (expected value) – are sufficient to establish a prima facie case of a discriminatory pattern-or-practice. *See, e.g., Hazelwood*, 433 U.S. at 308 n.14 (citing *Castaneda v. Partida*, 430 U.S. 482 (1977)); *Brown v. Nucor Corp.*, 576 F.3d 149, 156 n.9 (4th Cir. 2009).  Such evidence need not be perfect, prove the discrimination with absolute certainty, or include every measurable variable. *See, e.g., Bazemore v. Friday*, 478 U.S. 385, 400 (1986); *EEOC v. American National Bank*, 652 F.2d 1176, 1191-93 (4th Cir. 1981); *Capaci v. Katz & Besthoff, Inc.*, 711 F.2d 647, 653 (5th Cir. 1983).

As a consequence of its default, Defendant has now admitted that during the period 2014 to the present, its owner, Lazaro "Larry" Lopez, "regularly refused to hire female job applicants or other female job seekers for demolition and laborer positions or to assign/place female employees in such positions because of their sex, female" and directed his subordinate employees to do the same. ECF No. 1 at ¶¶ 14-16 (EEOC's Complaint).  Defendant has further conceded that Lopez indulged sex-discriminatory worker preferences of its business customers, both inviting sex-based requests for workers and implementing sex-based selection criteria for making worker job assignments. *Id.* at ¶ 17.

Defendant has also admitted that throughout the period 2014 to present, its Chief Operating Officer Carrie Willemin and other managers and supervisors "made sex-based job assignments for demolition, laborer and cleaning positions and have refused to hire female job applicants or other female job seekers or to assign/place female employees in demolition and general laborer positions because of their sex." *Id.* at ¶ 18.  Defendant has further conceded, consistent with Lopez's sex-discriminatory directives, that its "employees responsible for communicating with job applicants and other job seekers and with employees about employment opportunities have stated expressly sex-based criteria for availability of jobs/assignments/placements, including making statements on

multiple occasions to females who contacted Defendant about employment opportunities that Defendant was only seeking to hire men for certain positions and certain assignments to its business customers." *Id.* at ¶ 19. *See also* Exb. 22 at ¶ 4 (C. Mendez Declaration) (recounting statement by Defendant employee that Lopez instructed staff to not hire females).

In that regard, Defendant has admitted that in 2017, its Placement Coordinator Carlos Guzman, and its receptionist Stephanie Ziolkowski told Charging Party Yolanda Jimenez de la Cruz, as well as another female caller, that Defendant was only hiring males for demolition job assignments, thereby deterring Jimenez from making any further efforts to seek job placements from Defendant. *Id.* at ¶¶ 27-30.[1] Lopez also made sex-biased remarks to Charging Party Quandra Gaines, who was seeking laborer work, about her ability as a woman to work in the position, and after which Defendant refused to accept Gaines's application-related materials, thus causing Gaines to decline to seek further employment opportunities with Defendant. *Id.* at ¶¶ 24-26.

Defendant has also admitted that Charging Party Denise Williams, who obtained a short-term demolition job assignment, and other female workers were denied equal job duties as compared to their male peers. Williams and the other female workers were not allowed to operate demolition equipment but were instead mostly relegated to picking up debris from demolition activities generated by their male counter-parts. *Id.* at ¶ ¶ 22-23; Exb. 12 at ¶ 7 (Hernandez Declaration) (recounting female workers not permitted to use demolition tools, relegated to cleaning debris and "fetching things the male workers needed"); Exb. 21 at ¶ 5-6 (McCray Declaration) (recounting female workers assigned different duties than male co-workers, required to clean and sweep). *See also* Exb. 48, ¶ 11 & Attachment F (Williams charge of discrimination).

---

[1] EEOC has custody of audio recordings of the two telephone communications with Ziolkowski, which were obtained from witnesses during the agency's administrative charge investigation. The audio files and transcriptions of the same are available for review by the Court upon request. In light of Defendant's admissions-by-default concerning those communications, EEOC has opted to not file that evidence.

These female workers' experiences are consistent with what Lopez told Ms. Gaines she would experience on the job. *See* ECF No. 1 at ¶ 24.

The foregoing admissions also comport with EEOC's documentary evidence showing sex discrimination against women workers in job assignments, including text messages transmitted by owner Lopez, COO Willemin, and others, and Defendant's written job orders reflecting overtly sex-biased worker assignment decisions. *See* Exb. 48, ¶ 6 & Attachment A at 2-8 (text communications between Lopez, Willemin, other Defendant personnel and customer showing sex-based job assignments, job orders).

All of the aforementioned personnel either directed and/or carried out Defendant's recruitment and hiring process. *See* Exb. 48, ¶ 7 & Attachment B at 1 (Defendant's response to EEOC investigative Request for Information) (listing Larry Lopez, Carrie Willemin, General Manager Alexander Miranda and Stephanie Aguilera (now Ziolkowski) as persons "responsible for interacting with, screening, recruiting, interviewing, or selecting candidates"); Exb. 48, ¶ 8 & Attachment C (notes of EEOC interview of Carlos Guzman, Stephanie Aguilera) (identifying Guzman job duties to include making worker job assignments, Ziolkowski job duties to include communication with applicants about prospective employment and taking applications).

The foregoing admissions also comport with the first-hand experience of EEOC's claimants, who witnessed a pattern of sex-discriminatory conduct directed by Defendant's personnel toward themselves and other female workers seeking job placements or toward women who managed to obtain relatively brief job assignments, including numerous statements by Defendant's personnel constituting direct evidence of sex discrimination. *See* Exb. 1 at ¶ 6 (Aguilera Declaration); Exb. 3 at ¶ 3 (Aquino Declaration); Exb. 4 at ¶ 3 (Belt Declaration); Exb. 5 at ¶ 4 (Berrios Declaration); Exb. 7 at ¶ 4 (Coc de Jesus Declaration); Exb. 8 at ¶¶ 4-7 (Collins

Declaration); Exb. 9 at ¶¶ 5-7 (Corrales Declaration); Exb. 12 at ¶¶ 5-7 (Hernandez Declaration);

Exb. 18 at ¶ 5 (Lainez Declaration); Exb. 19 at ¶¶ 5-6 (Lemus Declaration); Exb. 20 at ¶ 4 (Lopez

Declaration); Exb. 22 at ¶ 4 (C. Mendez Declaration); Exb. 23 at ¶ 3 (N. Mendez Declaration);

Exb. 27 at ¶¶ 4-6 (L. Oliva Declaration); Exb. 28 at ¶¶ 4-6 (R. Oliva Declaration); Exb. 29 at ¶¶

5-7 (K. Ordonez Declaration); Exb. 30 at ¶¶ 3-4 (R. Ordonez Declaration); Exb. 31 at ¶ 4 (Pereira

Declaration); Exb. 33 at ¶¶ 3, 6-7 (Ramos Declaration); Exb. 39 at ¶ 5 (D. Torres Declaration);

Exb. 40 at ¶ 2 (I. Torres Declaration); Exb. 41 at ¶¶ 3-4, 6 (Trujillo Declaration); Exb. 46

(Declaration of Heidy Luis) (certifying Spanish translations provided to limited English proficient

claimants).

Taken together, the foregoing Defendant admissions and anecdotal evidence of sex

discrimination against women workers is more than sufficient to demonstrate that default judgment

is warranted on pattern-or-practice discrimination liability as to both EEOC's hiring/job

placements discrimination claim and its discriminatory assignment of job duties claim. The Fourth

Circuit has found that plaintiffs have established a pattern-or-practice violation with direct and

other anecdotal proof of discrimination less voluminous than that presented by EEOC in this

matter. *See United States v. Gregory*, 871 F.2d 1239, 1241-43 (4th Cir. 1989) (recounting sheriff's

statements of policy of discrimination against female applicants for deputy sheriff and concluding,

"As the Government has pointed out, if the admissions are credited, the Title VII violation has

been proven [and] [r]eversal is warranted on that basis alone.").

The propriety of default judgment as to liability is further demonstrated by the substantial

sex disparities in Defendant's job placement patterns adversely affecting female workers seeking

demolition and general laborer positions. As Defendant has admitted, it "has hired and/or

assigned/placed female workers into demolition and laborer positions at substantially lower rates

relative to male workers while hiring and/or assigning/placing female into cleaning positions at substantially higher rates than male workers." ECF No. 1 at ¶ 31.

Statistical evidence submitted by EEOC's Rule 26(a)(2) expert witness, Erin George, Ph.D., a labor economist, comports with the foregoing admission, demonstrating that Defendant did in-fact maintain a pattern-or-practice of sex discrimination against female workers. Dr. George analyzed Defendant's hiring/job assignment patterns by examining data produced to EEOC during the agency's administrative charge investigation showing the pool of workers from which Defendant made job assignments and the job assignments it actually made during the period for which Defendant's records were available (January 1, 2017 to September 2019).[2] *See* Exb. 47 at ¶¶ 2-3, 5-7 (Declaration of Erin E. George, Ph.D.). Despite her use of a methodology favoring Defendant, Dr. George found statistically significant sex disparities in Defendant's assignment of workers to demolition and general laborer positions, with women workers obtaining significantly fewer such assignments relative to their male counterparts. *See id.* at ¶¶ 3-4, 10-11, 14-15, 18. Depending on the assumptions used for the statistical model, during the two-year and nine-month time period analyzed, female workers received in the range of 426 to 486 fewer job assignments in demolition and general laborer positions than would be expected given their representation among the pool of workers from which Defendant made such assignments. *See id.* at ¶¶ 11, 13, 15, 18 & Table 4. Using both proportions testing and tobit regression analysis, these sex disparities were found to be statistically significant, ranging from 2.84 to 3.1 standard deviations from the mean. *See id.* at ¶¶ 11, 15.

The Fourth Circuit and other federal courts have repeatedly found that plaintiffs proved

---

[2] As a consequence of Defendant's complete cessation of operations and default in this case, EEOC was unable to obtain discovery of company records for time periods after September 2019. Accordingly, Dr. George limited her statistical analysis to the period ending on that date.

pattern-or-practice violations using statistical techniques and data that were less-sophisticated and less-complete than those presented in this case. *See Hazelwood*, 433 U.S. at 308 n.13 (discussing *Teamsters*); *United States v. Gregory*, 871 F.2d 1239, 1243 (4th Cir. 1989) (relying on data showing availability of women in general population); *Lilly v. Harris-Teeter Supermarket*, 720 F.2d 326, 336 (4th Cir. 1983); *EEOC v. American National Bank*, 652 F.2d 1176, 1189-90 (4th Cir. 1981) (holding static or "snapshot" work force data showing gross disparities without probability analysis established prima facie case).

Thus, the totality of well-pleaded facts that Defendant has admitted, as well as the evidence presented in support of the present Motion, demonstrate that default judgment is clearly warranted regarding Defendant's liability for sex discrimination against female workers in hiring/job assignments and assignment of work duties. The only remaining issue is the appropriate remedy for Defendant's class-wide Title VII violations.

2. **Defendant's default, resulting admissions and other evidence also warrant entry of default judgment on remedies**

a. *Under Rule 55(b)(2), the Court is authorized to determine and award monetary remedies without conducting an evidentiary hearing*

Consistent with their discretion regarding default judgment on liability issues, district courts "can also make a determination of damages without a hearing so long as there is an adequate evidentiary basis in the record for the award." *Silbaugh v. Omni Credit*, No. CIV. ELH-11-1387, 2012 WL 294870, at *1 (D. Md. Jan. 31, 2012), *report and recommendation adopted sub nom.*, *Silbaugh v. Omni Credit Servs. of Fla., Inc.,* No. CIV.A. ELH-11-01387, 2012 WL 612480 (D. Md. Feb. 23, 2012) (citing *Stephenson v. El–Batrawi,* 524 F.3d 907, 917 n. 11 (8th Cir. 2008) and *Adkins v. Teseo,* 180 F. Supp.2d 15, 17 (D.D.C. 2001)). In lieu of conducting a hearing on damages, Rule 55(b)(2) authorizes the district court to rely on affidavits/declarations or other

documentary evidence to establish a reasonable basis for a statutory damages award. *See, e.g.,* *Lipenga v. Kambalame*, 219 F. Supp.3d 517, 525 (D. Md. 2016) (holding default judgment appropriate and awarding lost wages, compensatory damages and punitive damages to plaintiff asserting human trafficking claims without hearing); *Educ. Credit Mgmt. Corp. v. Optimum Welding*, 285 F.R.D. 371, 373 (D. Md. 2012); *Realsongs, Universal Music Corp. v. 3A North Park Ave. Rest Corp.*, 749 F. Supp.2d 81, 85 (E.D.N.Y. 2010) (citing *Acton S.A. v. Marc Rich & Co., Inc.*, 951 F.2d 504, 508 (2d Cir. 1989)); *Adkins v. Teseo*, 180 F. Supp.2d 15, 17 (D.D.C. 2001) (citing *United Artists Corp. v. Freeman*, 605 F.2d 854, 857 (5th Cir. 1979)).

b.  *A class-wide back pay award, to be distributed among the EEOC claimants in equal shares, is appropriate in this case*

In its Complaint, EEOC seeks recovery of back pay owed to the charging parties and the class of other aggrieved female workers incurred as a result of Defendant's sex discrimination in hiring/provision of job assignments for demolition and general laborer positions. ECF No. 1 at 9-10 ¶¶ C, D, E & F.  Inclusive of the charging parties, EEOC has been able to identify 48 aggrieved female workers entitled to relief for Defendant's Title VII violations, 47 of whom are entitled to back pay.[3] *See* Exbs. 1-45 (declarations of EEOC claimants); Exb. 48, ¶ 12 & Attachment G (Jimenez charge of discrimination); Exb. 48, ¶ 13 & Attachment H (Gaines charge of discrimination). *See also* ECF No. 1 at ¶¶ 20-29 (allegations concerning Charging Parties Jimenez, Gaines and Williams).

Given the nature of Defendant's operations related to worker hiring/job placement, as well as the condition of Defendant's business records available to EEOC, individualized back pay determinations are not necessary or appropriate in this action.  Defendant is a staffing company. As is true of most staffing companies, rather than posting specific, permanent job vacancies,

---

[3] EEOC no longer seeks a back pay award for Charging Party Denise Williams.

Defendant maintained a roster of workers who had previously expressed interest in employment who were later contacted by Defendant about temporary assignments on a rolling (and recurring) basis as customers placed job orders requesting workers. Exb. 48, ¶ 8 & Attachment C (notes of EEOC interview of Carlos Guzman and Carrie Willemin) (describing process for receiving customer job orders, reviewing available workers in Defendant's database, and contacting workers in database for job assignments); Exb. 48, ¶ 9 & Attachment D at Request 9 (Defendant response to EEOC investigative Request for Information) (describing assignment process); Exb. 48, ¶ 7 & Attachment B at Request 11 (Defendant response to EEOC investigative Request for Information) (noting recruitment process continuous, not for specific positions).  Those workers could, and usually did, receive a series of multiple job placements over time.  Exb. 47 at ¶ 14 (Declaration of Erin E. George, Ph.D.) (noting only 35% of workers who received jobs were limited to a single job placement); Exb. 48, ¶ 8 & Attachment C (notes of EEOC interview of Carrie Willemin) ("Employee is active even after the assignment ends. You only have to apply one time[.]"); Exb. 48, ¶ 14 & Attachment I at 7, 19 (worker orientation Powerpoint presentation describing procedures).  In other words, unlike more traditional employment, EEOC's claimants did not apply for specific, discrete job openings; rather, they applied to be considered for any and all job assignments with any of Defendant's many staffing customers as opportunities became available.

That business model gives rise to certain questions that cannot be answered from the available evidence.  Specifically, there are no Defendant records in EEOC's possession from which the agency or the Court could determine (1) which particular EEOC claimants were considered and rejected for specific temporary job assignments with particular customers among the more than 400 lost job opportunities that should have gone to women workers; or, more significantly, (2) which EEOC claimants Defendant refused to consider for each of those particular job

assignments because Defendant knew they were females; or (3) how many of those temporary job assignments each individual class member would have obtained had they been given the opportunity to show their capabilities and compete for assignments on equal footing with male workers. The records reflect the names of workers who were selected to work on particular customer contracts, but the contours of the subpopulation of candidates from which those workers were drawn at any given point in time cannot be ascertained based on the data obtained by EEOC during its investigation. *See* Exb. 48 at ¶ 16 (Declaration of Phillip Hoefs) (stating Defendant's records in EEOC possession do not identify which workers were considered but not selected for each job assignment or who were refused consideration for each job assignment; records of calls or text messages to workers are unavailable; date range that workers on roster were under active consideration for job placements not identified); Exb. 47 at ¶ 9 (Declaration of Erin E. George, Ph.D.) ("[I]t is not possible to conclude from the available data which particular job assignments would have gone to particular female employees, nor is it possible to determine the exact date of a particular lost job placement for a particular employee."). Moreover, in this case there are a number of EEOC claimants who Defendant did not consider for vacancies because they were *deterred* from seeking employment due to Defendant's overt sex-discrimination. *See* Exb. 23 at ¶¶ 2-3 (Mendez Declaration); Exb. 3 at ¶¶ 2-5 (Aquino Declaration); Exb. 30 at ¶¶ 2-5 (R. Ordonez Declaration); Exb. 33 at ¶¶ 2-4, 6-8 (Ramos Declaration); Exb. 37 at ¶¶ 2-3 (Solis Declaration); Exb. 40 at ¶¶ 2-4 (I. Torres Declaration);  Exb. 41 at ¶¶ 2-6 (Trujillo Declaration).  As to those workers, obviously, there would be no salient records, even if Defendant had kept such records concerning other workers.  Thus, unlike the usual permanent-employment hiring case, there is no way to match, one-for-one, specific jobs to specific EEOC claimants, or to pick which among them would have obtained the job assignments at issue, without engaging in speculation.

In this situation, where EEOC's claimants would have received multiple job placements over time in the absence of Defendant's sex discrimination but where those claimants also cannot be matched to specific job vacancies, the case law authorizes class-wide determination of back pay and distribution by use of a formula. The federal courts have consistently approved class-wide back pay awards in pattern-or-practice discrimination cases, most commonly with pro rata allocation among aggrieved persons, where it is impracticable to determine individualized back pay remedies, such as when the facts and circumstances would require the district court to engage in hypothetical judgments or speculation to identify whether particular aggrieved persons would have been selected for specific job vacancies in the absence of discrimination. *See, e.g., Pitre v. Western Elec. Co., Inc.*, 843 F.2d 1262, 1274-75 (10th Cir. 1988) (holding class-wide back pay determination appropriate where promotions were not posted, female candidates were discouraged from seeking promotion, and subjective criteria were used for selection decisions); *Catlett v. Missouri Highway and Transp. Com'n*, 828 F.2d 1260, 1267 (8th Cir. 1987) (citing cases); *Segars v. Smith*, 738 F.2d 1249, 1290-91 (D.C. Cir. 1984) ("[C]ourts have not required [individualized back pay] hearings when discrimination has so percolated through an employment system that any attempt to reconstruct individual employment histories would drag the court into "a quagmire of hypothetical judgments."); *Stewart v. Gen. Motors Corp.*, 542 F.2d 445, 452 (7th Cir. 1976) (holding class-wide back pay award appropriate in promotion discrimination case where employer lacked objective standards for promotion decisions that could be applied to identify persons who would have received the promotions in the absence of discrimination); *Pettway v. American Cast Iron Pipe Co.*, 494 F.2d 211, 260-61 (5th Cir. 1974) (holding class-wide back pay determination was appropriate).

14

As the Fifth Circuit has observed, "[W]hen . . . *the ambiguity of promotion or hiring practices* . . . or the illegal practices continued over an extended period of time calls forth the quagmire of hypothetical judgment discussed earlier, a class-wide approach to the measure of back pay is necessitated." *Pettway,* 494 F.2d at 261 (emphasis added).  "In such a situation a court may . . . award relief on a classwide, rather than individual, basis by calculating the number of positions for which class members should have been hired and distributing pro rata among all qualified class members the total amount of back pay for which the defendant may be held responsible." *Catlett*, 828 F.2d 1267.  In applying this class-wide back pay method, the Seventh Circuit noted three guideposts to be followed, all of which are salient here: "(1) unrealistic exactitude is not required; (2) ambiguities in what an employee or group of employees would have earned but for discrimination should be resolved against the discriminating employer; (3) the district court, far closer to the facts of the case than we can ever be, must be granted wide discretion in resolving ambiguities." *Stewart*, 542 F.2d at 452 (citing *Pettway*).

   c.   *A class-wide back pay award in the amount of $665,566.27 is supported by the evidence in this case; equal shares distribution of the award is equitable and appropriate*

EEOC's expert labor economist has conducted an analysis of Defendant's back pay liability in this case.  As discussed above, Dr. George first determined the shortfall of female demolition and general laborer job assignments, i.e., the number of lost job opportunities that would have gone to female workers in the absence of discrimination, determining that range to be between 426 and 486 lost job assignments over the period analyzed depending on the assumptions used. *See* Exb. 47  at ¶¶ 11, 13, 15, 18 & Table 4.  Dr. George then calculated the economic value of those lost job assignments by multiplying the number of lost job assignments by the estimated hourly wage rate ($15.00), number of hours worked per day (8), and average duration of each job assignment in days (10), adding interest compounded quarterly at the IRS tax underpayment rates

for the applicable time period. *See id.* at ¶¶ 13 & n.2, 15-18.  Based on these calculations, Defendant's aggregate back pay liability to the class ranges from $583,604.85 to $665,566.27, *see id.* at ¶¶ 17-18, depending on whether the model reduces the number of lost demolition and general laborer opportunities by the number of jobs obtained by women in other positions, such as cleaners (in other words, whether it is assumed that women workers would have received demolition or laborer assignments in lieu of, rather than in addition to, other types of assignments), *see id.* at ¶¶ 3, 18.

Based on the available evidence, the Court should award the higher figure calculated by EEOC's expert, $665,566.27.  In the absence of discrimination, it is not-at-all clear that female workers would have been denied demolition or general laborer positions of relatively short duration, ten days on average, simply because they received cleaning and other positions, also of relatively short duration, at other times.  It is entirely possible that absent sex discrimination, female workers would have received both their fair share of demolition and general laborer job assignments *and* the cleaning and other assignments that they actually received.  Because of Defendant's pattern-or-practice of sex discrimination, its opaque hiring process, and its non-existent records on this point, there is simply no way to know.  It is well-established that in such instances, where there is uncertainty in valuation of an equitable remedy, any ambiguities are to be construed against the wrongdoer. *E.g., Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 565 (1931) ("Whatever uncertainty there may be in this mode of estimating damages, is an uncertainty caused by the defendant's own wrongful act; and justice and sound public policy alike require that he should bear the risk of the uncertainty thus produced."); *Hairston v. McLean Trucking Co.*, 520 F.2d 226, 233 (4th Cir. 1975) ("[U]ncertainties in determining what an employee would have earned but for the discrimination, should be resolved against the

discriminating employer.") (citing *Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364 (5th Cir. 1974)); *Pitre v. Western Elec. Co., Inc.*, 843 F.2d 1262, 1277 (10th Cir. 1988) (same holding); *Stewart v. Gen. Motors Corp.*, 542 F.2d 445, 452 (7th Cir. 1976) (same holding). Thus, the higher figure of $665,566.27, which relies on an equally reasonable, alternative assumption, should be selected.

Defendant's records and business practices do not allow for a determination of which exact job assignments, or the precise number of job assignments, that would have gone to each individual female worker. Given this uncertainty in the dates of jobs that would have been obtained, it is also not possible to determine whether and to what extent each of those aggrieved female workers had interim earnings during those relatively brief periods they would have worked for Defendant that would offset their back pay losses. And as a result, each class member's relative level of harm from the discrimination, which would be necessary for a pro rata distribution proportional to their degree of harm, also cannot be determined. Under these circumstances, the most equitable and efficient distribution is equal division among the eligible claimants that EEOC has been able to identify from Defendant's records and other sources after extensive efforts. The resulting back pay awards are modest relative to the scope of the Title VII violations: $14,160.98 per EEOC claimant.

Given the foregoing authorities and the circumstances of this case, EEOC requests that the Court enter final judgment in favor of EEOC awarding back pay in the amount of $14,160.98 per claimant to the aggrieved persons listed in Exhibit 49 to this Memorandum. *See id.* As a result of the default judgment against Defendant on pattern-or-practice liability, each EEOC claimant is legally presumed to be a victim of discrimination entitled to relief upon a showing that they are

female and sought employment, or were unlawfully deterred from doing so,[4] during the period for which liability is found. In that regard, each of the aforementioned persons either (a) actively sought demolition and/or general laborer employment through Defendant, (b) were reasonably deterred by Defendant's sex-discriminatory conduct from seeking such employment, or (c), in some instances, both sought employment with Defendant and were deterred during the liability period in this case, which commences on or after December 17, 2016.[5] *See generally* Exbs. 1–45 (EEOC claimant declarations); *see also* Exb. 48, ¶ 12 & Attachment G (Jimenez charge of discrimination); Exb. 48, ¶ 13 & Attachment H (Gaines charge of discrimination); ECF No. 1 at ¶¶ 24-30 (admitted facts concerning Yolanda Jimenez de la Cruz and Quandra Gaines application efforts). Since Defendant has defaulted and is not defending this action, there will not be any showing that any of the EEOC claimants were denied job assignments for non-discriminatory reasons. Accordingly, the legal presumption that the EEOC claimants were victims of sex discrimination arising from the pattern-or-practice showing cannot be rebutted, and EEOC has

---

[4] It is well-established under the "futile gesture" doctrine that workers who were reasonably deterred from seeking jobs with an employer due to that employer's discriminatory conduct state an actionable claim for denial of hire without proof that they applied for those jobs. *See, e.g., International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 365-67 (1977) (holding job seekers not required to submit applications if reasonable person would conclude there was no chance of hire due to discriminatory practices); *United States v. Gregory*, 871 F.2d 1239, 1242 & n.8 (4th Cir. 1989) (holding job-seeker who did not apply for deputy sheriff position due to sex-discriminatory remarks by hiring official could recover under futile gesture doctrine) (citing *Teamsters*); *Holsey v. Armour & Co.*, 743 F.2d 199, 208-09 (4th Cir. 1984) (holding employee not required to apply for promotion to recover for discrimination claim; stating, "[A]n employer's policy of discrimination 'can be communicated to potential applicants more subtly but just as clearly by an employer's actual practices—by his consistent discriminatory treatment of actual applicants, by the manner in which he publicizes vacancies, his recruitment techniques, his response to casual or tentative inquiries, and even by the racial or ethnic composition of that part of his work force from which he has discriminatorily excluded members of minority groups.'") (quoting *Teamsters*); *Hairston v. McLean Trucking Co.*, 520 F.2d 226, 231-32 & n.2 (4th Cir. 1975) (holding plaintiffs could obtain back pay award for discriminatory failure to promote notwithstanding failure to request promotion when defendant's occupational segregation and no-transfer and no-rehire policies rendered such requests futile) (citing authorities).

[5] As reflected in its expert's declaration, EEOC has not calculated, or estimated by extrapolation, Defendant's back pay liability for the period after September 2019 due to unavailability of data. Given the procedural posture of this case and Defendant's discontinuance of business operations, and in the interest of expediency of judgment and promptly commencing post-judgment asset discovery and collection efforts, EEOC has opted to not request back pay for the period after September 2019. Doing so would result in additional proceedings and delays both in obtaining final judgment and execution on the judgment.

therefore demonstrated their entitlement to back pay awards.

Additionally, EEOC has demonstrated that three EEOC claimants—Charging Party Denise Williams, Yanira Hernandez and Brittley McCray—are also entitled to relief for being subjected to sex-discriminatory job duties, i.e., being relegated to cleaning debris, "fetching things" for male peers carrying out demolition work, and doing other unskilled work rather than being allowed to perform more skilled demolition tasks such as use of demolition equipment. *See* ECF No. 1 at ¶ ¶ 22-23 (admitted facts regarding Denise Williams); Exb. 12 at ¶ 7 (Hernandez Declaration); Exb. 21 at ¶ 5-6 (McCray Declaration).   EEOC seeks awards of punitive damages for this claim, discussed *infra.* These additional requested amounts are also set forth in the list of EEOC claimants who are entitled to relief at Exhibit 49.

d.   *Punitive damages awards without hearing are authorized by Rule 55(b)(2)*

Consistent with the foregoing authorities, this Court and other federal courts have also repeatedly awarded punitive damages under Rule 55(b)(2) without the need for an evidentiary hearing when such damages were adequately supported by the record, such as the defendants' admissions and supporting declarations/affidavits. *See, e.g., Lipenga v. Kambalame*, 219 F. Supp.3d 517, 525 (D. Md. 2016) (holding default judgment appropriate and awarding wages, compensatory damages and punitive damages to plaintiff asserting human trafficking claims without hearing); *James v. Frame*, 6 F.3d 307, 309-11 (5th Cir. 1993) (holding that district court did  not  abuse  its discretion when  awarding punitive damages without  a hearing);  *EEOC  v. Workplace Staffing Sols.*, Case No. 1:15cv360-LG-RHW, 2016 WL 3676656, at *3 (S.D. Miss. Jul. 7, 2016) (awarding punitive and compensatory damages in Title VII class-wide hiring discrimination case against temporary staffing agency based on EEOC claimant affidavits); *Cutcliff v. Reuter*, No. 2:06-CV-04123-NKL, 2014 WL 229179, at *2 (W.D. Mo. Jan. 21, 2014)

(awarding punitive damages without hearing in case involving Ponzi scheme); *Pa. Nat'l Mut. Cas. Ins. Co. v. Edmonds*, Civil Action No. 09-0089-WS-B, 2010 WL 761332, at *7-8 (S.D. Ala. Mar. 3, 2010) (awarding $150,000 in punitive damages without a hearing); *Earthlink, Inc. v. Log On Am. Inc.*, No. 1:02-CV-1921-JOF, 2006 WL 1835426, at *4 (N.D. Ga. Jun. 30, 2006) (awarding punitive damages for default judgment without hearing); *see also Ensley v. Gene's Wrecker Serv., Inc.*, No. 3:16CV713-MCR-CJK, 2019 WL 1063392 (N.D. Fla. Feb. 4, 2019) (awarding punitive damages under Florida law without the need for a hearing).

     e. *Defendant's admissions and the evidence in this case establishes the EEOC claimants' entitlement to punitive damages awards*

In its Complaint, EEOC seeks recovery of punitive damages to be awarded to the charging parties and the class of other aggrieved female workers subjected to Defendant's sex-discriminatory employment practices. *See* ECF No. 1 at 11 ¶¶ O, P, Q & R.  The Fourth Circuit has held that in order to award punitive damages under Section 1981a, there must be sufficient evidence to establish four facts: "(1) [t]hat the employer's decision maker discriminated in the face of a perceived risk that the decision would violate federal law; (2) [t]hat the decision maker was a principal or served the employer in a managerial capacity; (3) [t]hat the decision maker acted within the scope of his employment in making the challenged decision; and (4) [t]hat the employer failed to engage in good-faith efforts to comply with the law." *EEOC v. Federal Express Corp.*, 513 F.3d 360, 372 (4th Cir. 2008) (citing *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 443-45 (4th Cir. 2000)).

The first fact, that Defendant discriminated in the face of a perceived risk it was violating federal law, is established by Defendant's default and consequent admissions.  In its Complaint, EEOC alleged that Defendant has engaged in a long-standing, intentional pattern-or-practice of sex discrimination against female workers in hiring/job assignments and assignment of job duties.

*See generally* ECF No. 1. EEOC further averred that Defendant committed those unlawful employment practices alleged in the Complaint "with malice or with reckless indifference to the federally protected rights of Denise Williams, Quandra Gaines, Yolanda Jimenez de la Cruz, and a class of female employees, job applicants and potential job applicants." ECF No. 1 at ¶¶ 37, 42. These allegations are now to be taken as proven, as they relate to Defendant's state of mind, not the "amount of damages." Fed. R. Civ. P. 8(b)(6).

Accordingly, by operation of its default, Defendant has admitted that its sex discrimination was carried out with malice and reckless disregard for the rights of EEOC's claimants. The scienter requirement for a punitive or exemplary damages award is established by a defendant's admission-by-default to the allegation that its conduct was reckless or willful. *See Derek Andrew, Inc. v. Poof Apparel Corp.*, 528 F.3d 696, 702 (9th Cir. 2008) (affirming award of attorney fees for malicious, fraudulent, deliberate, or willful violation of Lanham Act; holding state of mind allegation in complaint and defendant's admission-by-default sufficient to support award); *Griego v. Arizona Partsmaster, Inc.*, No. 20-CV-0639-WJM-MEH, 2021 WL 1541709, at *1 (D. Colo. Apr. 20, 2021) ("Plaintiff's allegations, deemed admitted by Defendant on default, establish that Defendant engaged in discriminatory practices with malice or reckless indifference to her rights."); *Access Point Fin., Inc. v. A Royal Touch, Inc.*, No. 2:17-CV-02037-DCN, 2019 WL 13150916, at *5 (D.S.C. Sep. 17, 2019) (holding admission-by-default of allegation conduct was malicious, reckless, wanton or willful supported award of punitive damages for state law conversion claim); *Armeni v. Transunion LLC, Inc.*, No. 3:15-CV-00066, 2016 WL 5317593, at *4–5 (W.D. Va. Sep. 22, 2016) ("Courts routinely deem the allegations of willfulness admitted at the default stage. The Court sees no reason to depart from this standard practice.") (internal citations omitted); *Lyons P'ship, L.P. v. D & L Amusement & Ent., Inc.*, 702 F. Supp. 2d 104, 117 (E.D.N.Y. 2010) (holding

in trademark infringement action, "By virtue of their default, defendants have admitted plaintiffs' allegation that they acted knowingly and intentionally or with reckless disregard or willful blindness to plaintiffs' rights. Accordingly, plaintiffs are entitled to statutory damages."); *Montgomery v. Fla. First Fin. Grp., Inc.*, No. 6:06-CV-1639ORL31KR, 2008 WL 3540374, at *10 (M.D. Fla. Aug. 12, 2008) (awarding punitive damages under Florida law based on admission-by-default of allegation that conduct was done with malice and reckless disregard); *H-D Michigan, LLC v. Hannon*, No. CIV. 09-378-P-S, 2010 WL 915206, at *1 (D. Me. Mar. 7, 2010) (holding allegation of willful violation admitted through default sufficient to support fee award) (citing case law).

The available evidence in this case further establishes Defendant's reckless disregard for the claimants' Title VII rights. That evidence gives rise to a strong inference that Defendant's officials perceived the risk that the sex discrimination they perpetrated against female workers violated federal law.

The Fourth Circuit has consistently held that reckless indifference to rights protected under Title VII may be inferred from evidence that an employer's management officials involved in the discrimination possessed a rudimentary knowledge of Title VII's protections, such as knowledge of an anti-discrimination policy or EEOC-mandated notices to workers, or receipt of discrimination training. *See EEOC v. Federal Express Corp.*, 513 F.3d 360, 372-73 (4th Cir. 2008) ("[W]e have heretofore found evidence sufficient to support a jury finding of a perceived risk in cases where the employer's managerial agent had 'at least a rudimentary knowledge' of the import of a federal anti-discrimination statute.") (citation omitted); *Anderson v. G.D.C., Inc.*, 281 F.3d 452, 460 (4th Cir. 2002) (concluding jury entitled to find that supervisor who saw EEOC poster warning against sexual harassment perceived risk of violating Title VII); *Lowery v. Circuit City*

*Stores, Inc.*, 206 F.3d 431, 443-44 (4th Cir. 2000) (holding in intentional promotion discrimination case that decision-maker knowledge that federal anti-discrimination laws existed, as evinced by employer-provided training all managers received on federal anti-discrimination law, sufficient to permit inference of perceived risk).  The case law in other federal jurisdictions is in accord. *See, e.g., EEOC v. Wal-Mart Stores, Inc.*, 187 F.3d 1241, 1246 (10th Cir. 1999) (in ADA case involving discharge of deaf employee requesting accommodation, holding decision-maker's perception of the risk of violating ADA could be inferred from his general knowledge of ADA accommodation and anti-discrimination requirements); *Mathiason v. Aquinas Home Health Care, Inc.*, 187 F. Supp.3d 1269, 1279 (D. Kan. 2016) (awarding punitive damages after default in ADA action; finding evidence of employer's anti-discrimination policy proved awareness of ADA prohibitions).

Here, there are substantial indicia of Defendant's awareness that its sex-discriminatory employment practices were unlawful. During EEOC's administrative charge investigation, Defendant produced excerpts from its Employee Handbook that contain equal employment opportunity ("EEO") and affirmative action policies. *See* Exb. 48, ¶ 10 & Attachment E at 2-3 (Green JobWorks Employee Handbook). The Handbook affirmatively declares, "Green JobWorks' commitment to *fair employment practices*, equal employment opportunity and obeying *all Federal government* and Maryland State *laws and regulations affecting job applicants and employees*." *Id.*, Attachment E at 1 (emphasis added).  The Handbook then goes on to assert, "We will not discriminate against employees or applicants for employment on any legally recognized basis including, but not limited to . . . sex[.]" *Id.* at 2.  It also claims that the company has undertaken affirmative action efforts relating to women workers and others and that "[e]qual opportunity is a factor in all personnel decisions at Green Job Works." *Id.* at 3.  Defendant's

employment application form similarly reflects its policies and the awareness of its personnel of federal law prohibitions of sex discrimination in employment. *See* Exb. 48, ¶ 15 & Attachment J at 4 (Green JobWorks Application for Employment) ("*Green JobWorks is an equal opportunity employer and does not discriminate against any applicant or employee because of race, color, religion, sex, national origin, disability, age, or military or veteran status in accordance with federal law*.") (emphasis in original).  Given that these policies are set forth in Defendant's employee handbook, an inference arises that its officers, managers and supervisors were aware of them.

Notably, it is clear from Defendant's Handbook that its President and owner, Mr. Lopez, its COO, Ms. Willemin, and its supervisory personnel all possessed full knowledge of Defendant's written EEO and affirmative action policies barring sex discrimination and expressly acknowledging the existence of federal EEO laws.  As the Handbook states, "The President of the Company [Lopez] has the final decision and responsibility for the content of this handbook." Exb. 48, Attachment E at 1.  Thus, the handbook was approved by Mr. Lopez. *See id.*, Attachment B at 1 (listing Lopez as "President" of Defendant).  Moreover, in various places the Handbook identifies Ms. Willemin, either by title or email address, as a person to whom questions, concerns or complaints should be directed. *Id.* at 3 (listing "Chief Operating Officer" as point of contact under open door policy, "cwillemin@greenjobworks.com" as point of contact for privacy practices questions).  Finally, the Handbook specifically directs employees to "discuss equal employment opportunity related questions with your supervisor or any other member of management," *id.* at 3, thus raising a reasonable inference that supervisors and managers would have been familiar with the policy. *See also id.* at 3 (handbook provision stating, "Management personnel at every level

share the responsibility for promoting both affirmative action and equal employment opportunity to ensure that compliance is achieved.").

Thus, the evidence of Defendant's anti-discrimination policy and related procedures, which overtly acknowledge the federal law prohibition of sex discrimination in employment, create a strong inference that Lopez, Willemin and other supervisors must have perceived the risk that their sex discriminatory conduct violated federal law. Those Defendant officials were responsible for approving the content of the company's policy and implementing it, and therefore it can be inferred they possessed at least a rudimentary knowledge of the prohibition of sex discrimination in employment as expressly described in the policy.

Moreover, Defendant has previously admitted its receipt of two of the charges of discrimination in this matter, the Jimenez and Gaines charges alleging sex discrimination in hiring in violation of Title VII, on February 2 and February 6, 2018. *See* ECF No. 8-1 at 5-6 (memorandum in support of Defendant's motion to dismiss) ECF No. 8-2 at ¶¶ 12, 13 (Affidavit of Larry Lopez); Exb. 48, Attachments G & H (Jimenez and Gaines charges of discrimination). Therefore, it is also reasonable to infer that certainly not later than early 2018, Defendant was well-aware that its sex-discriminatory conduct may violate Title VII, yet Defendant persisted in its discriminatory practices.

Finally, the nature and circumstances of the Title VII violations at issue also give rise to a reasonable inference that Defendant's officials perceived the risk that their actions may violate federal law. The fact that the challenged conduct is egregious in nature is itself evidence of a defendant's reckless indifference or malice for purposes of a Title VII punitive damages award. *E.g., Kolstad v. American Dental Ass'n*, 527 U.S. 526, 538-39 (1999) (discussing inference of requisite mental state for award of punitive damages under Section 1981a). Similarly, it is well-

25

established under federal law that an alleged wrongdoer's perception of a substantial risk may be inferred solely from the fact that the risk would be obvious to a reasonable person in like circumstances. *See, e.g., Farmer v. Brennan*, 511 U.S. 825, 842 (1994) (stating subjective mental state of deliberate indifference in Eighth Amendment context may be inferred from obviousness of risk to reasonable person); *United States v. Kilty*, No. 19-50351, 2022 WL 152446, at *1 (9th Cir. Jan. 18, 2022) (unpublished) (holding circumstantial evidence of obviousness of risk was sufficient to establish actual knowledge of risk supporting involuntary manslaughter conviction); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 704 (7th Cir. 2008) (in securities fraud action, stating reckless disregard of risk that statements of material fact were false is inferable from obviousness of risk; commenting, "knowledge is inferable from gravity [of risk]").

The egregiousness of Defendant's Title VII violations in this case is clear, and the risk that Defendant's conduct was unlawful would be patent to any rational person in these circumstances. By its default, Defendant has now admitted to engaging in a multi-year pattern-or-practice of summarily denying female workers access to job opportunities solely because they are women. And apart from the offensiveness of the discrimination in-itself, Defendant frequently carried out that discrimination in a highly offensive manner, stereotyping EEOC's claimants, dismissing their need to support themselves and their families, and essentially telling many of the claimants to their faces that they are less valuable workers than men. In our society, and in this era, such behavior is regarded as *malum in se*. It would be obvious to any reasonable employer in the United States that such a course of conduct is very likely to be illegal.

Thus, Defendant's admissions in this case and the evidence amply demonstrates that it must have perceived the risk it was violating federal law when it engaged in a pattern-or-practice of sex discrimination against female workers.

The second fact establishing punitive damages liability, that the decision-maker was a principal or served the employer in a managerial capacity, is also clearly established. As discussed above, Lopez was responsible for establishing Defendant's pattern-or-practice of sex discrimination and directing his subordinates to carry it out, and he is the owner and President of Defendant. Similarly, Willemin was the COO, and she and other managers implemented the discriminatory practices at issue. Managerial capacity is established.

The third fact, that the decision-maker acted within the scope of his employment in making the challenged decision, is similarly established for the reasons discussed above. Lopez was clearly acting within the scope of his plenary authority as owner and President of Defendant when he subjected female workers to sex discrimination and directed his subordinates to do the same. Willemin and subordinate managers involved in the discrimination were likewise acting within their duties that, according to Defendant's own submissions to EEOC, involved hiring and job assignments. *See* Exb. 48, ¶ 7 & Attachment B at 1; Exb. 48, Attachment C (notes of EEOC interview of Carlos Guzman); *see also* Exb. 48, Attachment A at 2-8 (text messages).

The final fact, whether Defendant's managers acted contrary to any purported good faith efforts by the company to comply with Title VII, is an affirmative defense that Defendant was required to prove. *See Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 445 (4th Cir. 2000) (describing good-faith efforts as exception to punitive damages liability, affirming jury award of punitive damages because evidence at trial did not require reasonable jury to find that defendant engaged in such efforts); *Zimmermann v. Associates First Capital Corp.,* 251 F.3d 376, 385 (2d Cir. 2001); *Romano v. U–Haul Int'l,* 233 F.3d 655, 670 (1st Cir. 2000); *Passantino v. Johnson & Johnson Consumer Prods., Inc.,* 212 F.3d 493, 516 (9th Cir. 2000); *Deffenbaugh–Williams v. Wal–Mart Stores, Inc.,* 188 F.3d 278, 286 (5th Cir. 1999); *Long v. Welch & Rushe, Inc.*, 28 F.

Supp.3d 446, 463-63 (D. Md. 2014); *U.S. EEOC v. Federal Exp. Corp.*, No. WDQ–04–3129, 2006 WL 1134208, at *1 (D. Md. Apr. 25, 2006).

Having never timely filed an answer in this action and subsequently defaulted, Defendant has waived any purported good faith efforts affirmative defense. *See, e.g.*, Fed. R. Civ. P. 8(c)(1). Accordingly, EEOC need not present any evidence regarding Defendant's lack of good faith efforts to comply with Title VII.

Moreover, even if Defendant had pleaded good faith efforts, that defense would have been unavailable in this case. "[T]he mere existence of [a Title VII] compliance policy will not alone insulate an employer from punitive damages liability." *EEOC v. Fed. Express Corp.*, 513 F.3d 360, 374 (4th Cir. 2008). Instead, "an employer maintaining such a compliance policy must also take affirmative steps to ensure its implementation." *Id.* "Such a policy is not automatically a bar to the imposition of punitive damages." *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 446 (4th Cir. 2000). Otherwise, "employers would have an incentive to adopt formal policies in order to escape liability for punitive damages, but they would have no incentive to enforce those policies." *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 858–59 (7th Cir. 2001).

In that regard, the perpetrators of the sex discrimination at issue in this action, the owner and an officer, are alter egos/proxies of Defendant, persons who set policy direction for the corporation and determined its implementation. The *Kolstad* good faith efforts defense is unavailable when the discrimination at issue was perpetrated by an alter ego or proxy of the corporation. *See Passantino,* 212 F.3d at 516-17 & n.21; *Deters v. Equifax Credit Information Services,* 202 F.3d 1262, 1271 (10th Cir. 2000); *Hightower v. Roman, Inc.*, 190 F. Supp.2d 740, 753-54 (D.N.J. 2002); *Miller v. Rockford Register Star*, No. 98 C 50139, 2001 WL 637575, at *5 (N.D. Ill. Jun. 8, 2001). Vicarious liability principles do not apply in such situations, as an

enterprise incurs *direct liability* for the conduct of an alter ego or proxy.  In this case, in his capacity as owner and President, Lopez (and others at his direction) simply disregarded the company's written EEO policy and instead implemented a *de facto* policy or practice of sex discrimination against women workers.  As a consequence, punitive damages liability attaches for those actions.

      *f.    A punitive damages award in an amount that is three-times the back pay award is warranted by the facts of this case and case law*

It is a familiar principle that awards of punitive damages serve the twin purposes of retribution against the wrongdoer and deterrence of both the wrongdoer and others from engaging in similar conduct in the future. *E.g., Gore v. BMW of North America*, 517 U.S. 559, 568 (1996). And as the Supreme Court has observed, the remedial mechanisms of Title VII were specifically designed to serve as a "'spur or catalyst' to cause employers 'to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges' of discrimination." *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 358 (1995) (discussing deterrence goals of Title VII and ADEA) (quoting *Albemarle Paper Co. v. Moody*, 422 U.S. 405 1975)).  Consistent with these principles, punitive damages awards under Title VII are intended to serve the important goal of general deterrence of industry from engaging in similar acts of discrimination. *See U.S. EEOC v. Scott Medical Health Center, P.C.*, Civil Action No. 16-225, 2017 WL 5493975, at *6 (W.D. Pa. Nov. 16, 2017) (awarding punitive damages against defaulting employer despite bankruptcy, noting importance of general deterrence function served by Title VII punitive damages award); *McKnight v. Circuit City Stores, Inc.*, Civil Action No. 3:95CV964, 1997 WL 328638, at *7 (E.D. Va. Mar. 12, 1997) (declining to remit punitive damages award reflecting 18-to-one punitive/actual damages ratio, citing need for deterrence of defendant and similarly situated corporations); *Brown v. Amoco Oil Co.,* 793 F. Supp. 846, 850 & n.5 (N.D. Ind. 1992) (noting general deterrence objective of punitive damages under Section 1981a) (citing

Restatement (Second) of Torts § 908 (1979)).

An award of punitive damages to the EEOC claimants is warranted in this case. Title VII secures rights considered among the highest of national priorities and reflecting our core values as a nation. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 48 (1974) ("Congress indicated that it considered the policy against discrimination to be of the 'highest priority.'") (quoting *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400 (1968)). A pattern-or-practice of discrimination means that a company has adopted a standard operating procedure or policy of doing precisely that which Title VII expressly prohibits, and the reprehensibility of such a policy is manifest. At the direction of its owner and President, Defendant engaged in an intentional, multi-year pattern-or-practice of sex discrimination against female workers, denying them hundreds of employment opportunities simply because they are women. Defendant, its owner, an officer and other Defendant personnel carried out those unlawful employment practices under circumstances giving rise to a strong inference that they knew those practices violated federal law. Indeed, Defendant continued perpetrating its pattern-or-practice of sex discrimination even after it was under EEOC investigation.

Thus, Defendant's discriminatory conduct was reprehensible and caused large-scale injury to the class of workers aggrieved, and its state of mind when it engaged in that course of conduct was highly culpable. The twin purposes of punitive damages awards, punishment for wrongdoing and deterrence of the same, are therefore strongly implicated in this case, and a punitive damages award is warranted to secure those core remedial objectives.

The need for general deterrence is particularly strong in this case. It is well-documented that female workers in the construction industry and related occupations experience very high levels of sex discrimination in both hiring and while on-the-job. *See, e.g.,* PRESS RELEASE - EEOC

SHINES SPOTLIGHT ON DISCRIMINATION AND OPPORTUNITIES IN CONSTRUCTION (available at https://www.eeoc.gov/newsroom/eeoc-shines-spotlight-discrimination-and-opportunities-construction) (last visited 1/18/2023); HANNAH M. CURTIS ET AL., *GENDERED SAFETY AND HEALTH RISKS IN THE CONSTRUCTION TRADES*, 62 ANNALS OF WORK EXPOSURES AND HEALTH 404 (2018) (summarizing social science research regarding sex discrimination in construction and skilled trades, discussing potential effects of workplace discrimination against female workers on occupational injury rates and job-related psychological stress) (available at https://academic.oup.com/annweh/article/62/4/404/4868555; OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION, WOMEN IN THE CONSTRUCTION WORKPLACE: PROVIDING EQUITABLE SAFETY AND HEALTH PROTECTION (available at https://www.osha.gov/advisorycommittee/accsh/products/1999-06-01) (last visited 1/18/2023).

Note also that Defendant indulged discriminatory worker preferences of its business customers, companies that are still in operation and therefore presumably procuring workers either through other staffing firms or directly. A punitive damages award in this case is necessary to serve as a general deterrent to those customers who have previously used Defendant to carry out their sex discriminatory practices as well as other staffing firms still placing workers in the Baltimore-Washington, DC-Northern Virginia labor market who would do the same.

Accordingly, EEOC requests that the Court award punitive damages in the amount of $1,996,698.81 payable in equal shares to EEOC's 47 hiring discrimination claimants as a deterrent and retributive remedy. The per-claimant award will be $42,482.95. *See* Exb. 49. EEOC also requests that claimants Denise Williams, Yanira Hernandez and Brittley McCray receive an additional punitive damages award of $10,000.00 each for the sex-discriminatory job duties to which Defendant subjected them. *Id.*

The aforementioned per-claimant punitive damages awards are well-below the $100,000.00 per aggrieved person damages limitation that applies to this case by operation of 42 U.S.C. § 1981a(b)(3)(B). *See* ECF No. 1 at ¶ 6 (admitted fact that Defendant continuously employed more than 100 employees during liability period).  The fact that EEOC's requested punitive damages award falls squarely within the mid-range of authorized damages under Section 1981a despite the egregiousness of the challenged conduct further indicates that it is reasonable. *See EEOC v. Fed. Express Corp.*, 513 F.3d 360, 378 (4th Cir. 2008) ("[T]he fact that the punitive damages award, when aggregated with the compensatory damages award, was substantially below the $300,000 statutory cap on such damages, as provided for by 42 U.S.C. § 1981a, provides additional support for the reasonableness and constitutionality of the punitive damages award.").

EEOC's punitive damages request is also consistent with, or lower than, per-victim punitive damages awards made in other, comparable cases.  For instance, in *Wagner v. Dillard Dep't Stores, Inc.*, No. 1:98CV499, 2000 WL 1229648, (M.D.N.C. Jul. 20, 2000) *aff'd in part, vacated in part, rev'd in part,* 17 Fed. App'x 141 (4th Cir. 2001), a Title VII case involving claims of failure to hire because of pregnancy, a plaintiff was awarded $150,000 punitive damages, an award that the district court declined to reduce, noting among other factors that the ratio of punitive/actual damages was less than four-to-one. *Id.* at *1, *10.

In *EEOC v. Serv. Temps*, No. 3:08-CV-1552-D, 2010 WL 5108733 (N.D. Tex. Dec. 9, 2010), *aff'd sub nom., EEOC v. Serv. Temps Inc.*, 679 F.3d 323 (5th Cir. 2012), an ADA hiring discrimination case involving denial of placement of a single temporary worker by a staffing firm, the jury awarded $150,000 in punitive damages, which even after remittitur remained $68,800, a figure that was twice the sum of the back pay and compensatory damages awarded in that case, *id.* at *12, and much higher than the per-victim punitive damages award requested in this action.

In *Austrum v. Fed. Cleaning Contractors, Inc.*, No. 14-CV-81245-KAM, 2016 WL 3526130 (S.D. Fla. Jun. 23, 2016), an individual race discrimination case involving failure to hire for a building cleaning position, the jury awarded the plaintiff $100,000 in punitive damages and $72,194.95 for compensatory damages. *Id.* at *1.

Other jury awards in comparable cases are in accord. *See Christensen v. Titan Distribution, Inc.*, 481 F.3d 1085, 1096 (8th Cir. 2007) (affirming $97,500 individual punitive damages award in ADA hiring discrimination case); *Gibbons v. Bair Found., Inc.*, No. 104CV2018, 2007 WL 582314, at *8 (N.D. Ohio Feb. 20, 2007) (declining to overturn $40,000 punitive damages award to single plaintiff for denial of hire because of religion in violation of state anti-discrimination statute); *EEOC v. Wal-Mart Stores, Inc.*, 11 F. Supp.2d 1313, 1317 (D.N.M. 1998) (declining to overturn jury's $50,000 punitive damages award for failure to hire disabled worker for store position in violation of ADA; worker received $7500 compensatory damages award), *aff'd*, 202 F.3d 281 (10th Cir. 1999); *Barbour v. Merrill*, 48 F.3d 1270, 1275, 1277 (D.C. Cir. 1995) (affirming $25,000 award of punitive damages by jury in denial of hire case; $2500 awarded for compensatory damages). *See also Emmel v. Coca-Cola Bottling Co. of Chicago*, 95 F.3d 627, 636-38 (7th Cir. 1996) (affirming $292,675 punitive damages award in denial of promotion case; plaintiff awarded $43,000 in back pay and $7,325 in compensatory damages; jury found employer had policy of sex discrimination).

Finally, the three-to-one ratio of punitive/actual damages reflected in EEOC's request further establishes its reasonableness. The Fourth Circuit and other federal courts have consistently found that larger ratios were appropriate to serve punishment and deterrence goals and were not unconstitutionally excessive. *See, e.g., Morris v. Bland*, 666 Fed. App'x 233, 240–41 (4th Cir. 2016) (discussing reprehensibility of conduct warranting award and stating, "[T]he

33

total punitive damages award is approximately five times the compensatory damages award, and single digit ratios generally do not present a constitutional issue.") (citing *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408 (2003)); *EEOC v. Fed. Express Corp.*, 513 F.3d 360, 378 (4th Cir. 2008) (holding $100,000 punitive damages award for denial of ADA reasonable accommodation without job loss, representing 12.5 to 1 ratio, did not warrant remittitur); *Golson v. Green Tree Fin. Servicing Corp.*, 26 Fed. App'x 209, 216 (4th Cir. 2002) (affirming $230,000 punitive damages award for pregnancy discrimination claim, holding seven-to-one ratio not excessive); *U.S. EEOC v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1287 (7th Cir. 1995) ("We do not find $150,000 excessive. That [punitive damages] award is three times the amount of compensatory damages, and statutes routinely provide for double and treble damages awards to deter and punish . . . .").

**3.**    **Conclusion**

For the reasons set forth above, EEOC respectfully requests that the Court enter a final default judgment against Defendant in the total amount of $2,692,265.08, with individual awards set forth in the final judgment in the amounts stated in Exhibit 49 to this Memorandum.

Respectfully submitted,

___/s/_____
RONALD L. PHILLIPS
SUPERVISORY TRIAL ATTORNEY
EEOC – Baltimore Field Office
George H. Fallon Federal Building
31 Hopkins Plaza, Suite 1432
Baltimore, Maryland 21201
Telephone: (410) 801-6714
Facsimile: (410) 992-7880
E-mail: ronald.phillips@eeoc.gov